Donald QUICK and Beatrice Quick, Appellees-Appellants,

v.

AMERICAN STEEL AND PUMP COR-PORATION, Appellant-Appellee.

No. 373, Docket 31978.

United States Court of Appeals Second Circuit.

Submitted April 2, 1968.

Decided June 28, 1968.

---

Austin D. Graham, New York City (Hershcopf & Graham, New York City), for Donald and Beatrice Quick.

William H. Frappollo, New York City (John A. Vassallo, Saxe, Bacon & Bolan, New York City), for American Steel and Pump Corporation.

Before MOORE, WOODBURY * and SMITH, Circuit Judges.

WOODBURY, Senior Circuit Judge:

The plaintiff Donald Quick, referred to as the plaintiff hereinafter for the rights of his wife, the other plaintiff, are derivative, was employed by the defendant as its treasurer on October 1, 1947. In 1949, while continuing as treasurer, he became a vice president and a director of the defendant's subsidiary corporations and divisions and on November 29, 1954, he became the defendant's president. He was also a director and a stockholder. In June, 1960, the plaintiff for the first time entered into a written employment contract with the defendant. Under this five-year contract, retroactive to December 1, 1959, the plaintiff's salary was fixed at $30,000 per year plus an annual bonus of 2% of the defendant's pre-tax profits in excess of $500,000.

On February 1, 1961, the plaintiff and the defendant entered into a contract variously described as a "retirement agreement," a "deferred compensation agreement" or a "pension plan." In March, 1964, eight months before the plaintiff's employment contract was to expire, three men, Edward Krock, Robert Huffines and Victor Muscat, referred to in the record as the BSF group, acquired a controlling interest in the defendant's stock and at once became directors and high executive officers of the defendant corporation. The following minute appears in the record of a meeting of the defendant's board of directors held on November 19, 1964:

"Salary of President Quick. Mr. Muscat stated that the salary contract of President Quick would expire on November 30, and he, therefore, suggested that Mr. Quick confer with the chairman of the finance committee to work out a new contract, and that in the meantime Mr. Quick continued

---

* Of the First Circuit, sitting by designation.

[sic] to be paid in accordance with the terms of his present contract."

Negotiations between the plaintiff and the chairman of the defendant's finance committee, Mr. Krock, did not begin at once but they met for a full day of discussion on February 4, 1965, at Mr. Krock's home in Massachusetts. The testimony as to what actually took place at that conference is in some conflict as to details. It is evident, however, that no agreement was reached as to the plaintiff's future employment. The plaintiff's testimony not categorically disputed by Krock is that Krock offered the plaintiff future employment by the defendant at a salary of $12,500 per year plus the same bonus as before saying he and his two associates were taking no more than that apiece for their services and were doing as much for the defendant as the plaintiff. The plaintiff declined further employment on the terms offered, characterizing them as unfair, and left. No further progress was made over the telephone the next day but the parties agreed to meet again.

On February 10, 1965, on the eve of the annual meeting of the defendant's stockholders, the plaintiff met again with Krock in his hotel room in New York. At that time the parties did no more than reiterate their respective positions but they did agree to meet once more the next morning before the stockholders' meeting. They so met with counsel for the defendant also present. At that time the plaintiff was informed that "his resignation had been accepted" as of the night before and that in consequence he would not be nominated for reelection as president or a director. At that announcement the plaintiff said that he would accept the salary offered pending consultation with his attorney to see what his rights were, if any. Thereafter the plaintiff continued to report at his office and to receive his salary until February 15 when he was taken off the company payroll and his telephone and furniture were removed from his office.

The plaintiff bases his right to recover under the retirement plan on its preamble extolling his long service with the Company, the value of his services to the Company and expressions of a desire by the Company to retain his services until normal retirement age and thereafter in an advisory capacity for which it is recited the Company "* * * is willing to offer Quick an incentive * * * in the form of a retirement compensation and death and disability benefits" and on two specific provisions of the agreement. These are:

"1. Continuation of Employment. Quick shall continue in the employ of the Company, upon the same terms as heretofore, until the termination of his presently existing employment contract (November 30, 1964), and until such later date as shall be mutually agreed upon in new employment contracts to be subsequently entered into.

\* \* \* \* \* \*

"5. Termination of Employment Prior to Retirement.

(a) Termination By The Company.

In the event that Quick's employment is terminated by the Company for any reason whatsoever other than for indictable acts against the Company, payments to Quick, his spouse, and/or his Estate shall be made immediately upon such termination in accordance and under the terms set forth in Paragraph 2, supra, excepting therefrom the minimum annual payment of $12,000 provided in the second sentence of said paragraph.

(b) Termination By Quick.

In the event that Quick voluntarily terminates his employment with the Company, the Company shall be under no obligation to make any of the payments enumerated in this agreement."

The plaintiff contends that since he had not committed any indictable acts against the Company or voluntarily terminated his employment with the Company, but had in practical effect been

discharged, he is entitled to the benefits of his retirement plan. The defendant on the other hand takes the position that the undisputed fact that negotiations for a new contract failed does not warrant a finding that the Company had "terminated" Quick's employment as that word was used in the pension agreement. Its contention in a nut shell is: "A fair reading of the contract shows that what it 'contemplated'—and what the Company bargained for in giving the plaintiff a lifetime pension and death benefits— was that the parties enter into *new long term employment contracts* similar to the plaintiff's subsisting agreement." Wherefore, the argument runs, since negotiations for a long term contract came to nought, the defendant is under no obligation to the plaintiff under the pension agreement.

The court below in colloquy with counsel clearly indicated that it did not agree with the defendant's interpretation of the contract and that it considered the question of contract interpretation for the court and not for the jury. Nevertheless, having a jury present the court submitted the question to the jury under appropriate instructions and the jury found for the plaintiff. The court expressed itself as entirely satisfied with the verdict. It said: "My feeling is that a jury was not required in this case, and had it been left to me I would have decided precisely as the jury did."

We quite agree.

■ To adopt the defendant's interpretation of the pension plan would be to read into the document provisions which simply are not there. Nor are the provisions urged upon us by the defendant reasonably to be implied in view of the fact that the plaintiff served the defendant under a written employment contract for only 5 out of nearly 18 years. And certainly the jury, or any fact finder, would be well warranted in concluding that refusing the plaintiff future employment unless he would accept less than half his previous salary was a none too subtle way of "terminating" his employment. The plain and obvious fact is that after November 30, 1964, when the employment contract of June, 1960, expired, the plaintiff was working under a new employment contract arising out of the action taken by the defendant's board of directors on November 19, 1964, quoted above and his continued performance of services until his salary was stopped and he was put out of his office, in effect "fired," on February 15, 1965.

■■ There is no occasion to consider the Company's assertions of errors in the admission of evidence and error in the charge to the jury. The question presented is simply one of contract interpretation and application of the contract as interpreted to undisputed basic facts. This presents no jury question as the trial judge recognized although having a jury already empaneled he submitted the question to the jury just to be on the safe side. Since the plaintiff is entitled to recover as a matter of law, errors in the admission of evidence and in the charge, if there were any, are irrelevant.

The question remains whether the plaintiffs are entitled to acceleration of the stipulated amount of the payments found to be due them under the retirement plan.

Counsel have not given any attention to the problem of choosing the law applicable to this question and have not adduced any facts from which we may select the appropriate state law to apply. We therefore resort to and apply general legal principles.

■■ It will suffice to say that we see no reason not to apply the usual rule that contracts to pay money in instalments are breached one instalment at a time. New York Life Ins. Co. v. Viglas, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936); 5 Williston on Contracts, Rev. Ed. §§ 1330A, 1330B; Am. Law Inst., Restatement, Contracts §§ 316, 318.

Affirmed.