### Harry W. TALKINGTON

v.

### ANCHOR GASOLINE CORPORATION.

No. 2:92–0050.

United States District Court,
M.D. Tennessee,
Northeastern Division.

May 20, 1993.

Eugene Jared, Cookeville, TN, for plaintiff.

Joseph N. Clarke, Jr., Knoxville, TN, for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

This case involves a breach of contract claim. The plaintiff alleges that the defendant corporation's president orally promised to provide deferred compensation in lieu of the company's standard retirement plan, and the employer defends primarily on the basis of the statute of frauds. This court has jurisdiction by diversity of citizenship. The court finds in favor of the plaintiff and awards damages in the amount of $33,000 plus prejudgment interest.

### I. FACTS

The court conducted a bench trial beginning 17 March 1993, and makes the following findings of fact. The defendant is Anchor Gasoline Corporation ("Anchor Gas"), an Oklahoma corporation with principal offices in Tulsa. Anchor Gas owns 80 percent of the stock in Anchor Coal Company ("Anchor Coal"), and the Joe Wright family, 20 percent. Joe Wright was the chairman of the board and president of Anchor Gas as well as president of Anchor Coal until he died in

1986. Anchor Coal, in turn, owns the stock in Clear Creek Coal Company ("Clear Creek"), of which Joe Wright was also chairman.

## A. The Employment Agreement.

Before Anchor Gas incorporated Anchor Coal in order to purchase the stock in Clear Creek, Clear Creek's sole shareholder, president, and CEO was Harry Talkington, the plaintiff. Its principal business was deep shaft mining and marketing of coal from the Wilder Seam, in Tennessee. On 18 November 1970, Anchor Coal purchased Clear Creek from Talkington and hired him to supervise Clear Creek and in general be responsible for its operations. The purchase price was $100,000 cash with a $400,000 unpaid balance. A written employment agreement provided Talkington with a salary of $18,000 per year plus five percent of Clear Creek's net receipts for five years or until the balance of the purchase price was paid. Until this contract expired in 1977, Talkington served as president and as a director of Clear Creek.

Although he continued to work in this capacity after the first contract expired, Talkington eventually sought a new written agreement. By then he was an important asset of Clear Creek. He was well educated and well qualified for his position, and he was uniquely familiar with the geology of the Upper Cumberland region. In response to Talkington's request for a written agreement, and in order to keep him with the company, in May of 1978 Joe Wright verbally proposed the terms of Talkington's continued employment with Clear Creek. They were essentially the same as the previous written agreement, but with the addition of a deferred compensation feature by which, beginning five years after the agreement, Clear Creek would pay Talkington $1000 per month for each month that he had worked. Talkington verbally accepted the proposal and shook Wright's hand, and the court holds that at this time they had reached an agreement substantially in the following general form:

1. Clear Creek would hire Talkington for another five years at a salary to be adjusted as for other mining employees.

2. There would be a written agreement to memorialize their contract. This memorandum would reflect the terms they had agreed to, including Talkington's salary and the deferred compensation provision.

3. The memorandum would provide for the salary as reflected by his upcoming raise.[1]

There were other provisions as well, dealing with the effects of termination or resignation, bonuses,[2] and duties of the parties. Wright told Talkington that he would instruct Raynolds, the company attorney, to prepare a draft of their memorandum for Talkington's review. The purpose of the draft was not to continue the negotiations, but to afford Talkington an opportunity to be sure it properly reflected his agreement with Wright. Raynolds sent a draft under cover letter dated 26 October 1978. Talkington made minor changes to the draft copy and signed it.[3] He returned the draft to Wright and Raynolds, but they never prepared a signature copy and Wright never signed the draft.

Talkington pressed Wright more than once for his signature, but without success. The court concludes from testimony as to Wright's conduct and character that he was very proud of his reputation and would easily take offense if Talkington pressed too hard.

---

1. The draft later included his current salary, which Talkington corrected to reflect a raise which became effective in April 1979.

2. Along with the draft memorandum, Raynolds also sent a draft letter agreement which referred to a 20 percent override for Talkington, by which he was to be paid 20 percent of the profits of a new mine after all investments had been recovered. This provision was not bargained for. In fact, it came as a surprise to Talkington. The court holds that this was a gratuitous provision and is not enforceable against the defendant. In any event, the condition for its operation—profitability of the new mine—never came about.

3. Talkington first spoke to Wright concerning these changes, who instructed him to pencil them in for Raynolds to correct. Though this was only a draft copy, Talkington's signature showed that he received it and felt that, with his changes, it properly reflected their agreement.

Accordingly, it was reasonable for Talkington to rely on Wright's statement that Raynolds had been busy, that a signed writing was forthcoming, but that Talkington had his word on the deal anyway. Based on this conduct Talkington continued to work as agreed, and in order to preserve their relationship of friendship and mutual respect and to maintain a productive business relationship, he relaxed his efforts to obtain a signed memorandum of their agreement. He continued to work this way without any changes until 1981.

In that year, Talkington stopped working full time for Clear Creek because he started an enterprise of his own—Talkington Mining Corporation ("TMC"). Although he obtained Wright's permission to do this, there is not enough credible evidence to find that Wright and Talkington considered this a modification of the contract. It is unlikely that Wright would agree to less than half of Talkington's previous work without any corresponding change in Clear Creek's duties to Talkington. There is no evidence of the terms of this new contractual relationship other than the fact that Talkington continued to draw the same salary while working less. Whatever the terms of the new agreement, the court finds that the agreement Wright and Talkington had reached in May of 1978 was now terminated. Accordingly, the damages will be calculated only to that time.

### B. The Corporate Structure.

The defendants claim that Anchor Gas is not liable for any deferred compensation obligations of Clear Creek under Talkington's employment agreement. However, Anchor Gas formed Anchor Coal for the purpose of purchasing Clear Creek from Talkington, and advanced all of the funds necessary to keep Clear Creek in existence. Importantly, the three corporations had interlocking directorates and officers; the individuals who made decisions for the three were all the same.

There are other indications of instrumentality. Anchor Gas accountants did Clear Creek bookkeeping from Tulsa and prepared and filed Clear Creek's tax returns. Anchor Gas lawyers did Clear Creek's legal work, and Clear Creek's corporate officers were located in Anchor Gas's offices in Tulsa. Clear Creek never borrowed money from a commercial bank after 1970; all funds necessary for Clear Creek to exist were provided by Anchor Gas, and at the time Clear Creek was administratively dissolved, it owed Anchor Gas $2.7 million. Anchor Gas and its subsidiaries, including Clear Creek, filed consolidated tax returns and Anchor Gas received the tax benefits of Clear Creek's losses. Anchor Gas made the decision to shut down Clear Creek, sell its equipment, parts, and inventory, and apply the sale proceeds to its own account. Anchor Gas made the decision not to commit to Talkington's salary after November 1988. Anchor Gas made the decision to allow Clear Creek to be administratively dissolved.

In fact, as long as Wright was alive, the whole business was run like a "mom & pop" operation. Corporate formality was almost unheard of, and corporate acts were almost never approved by the board of directors or reflected in the corporate minutes.

## II. DISCUSSION

The defendant raises the defenses of the statute of frauds and separate corporate identity.

### A. Statute of Frauds.

Few areas of the law have departed so far from their original logical beginnings as the doctrines of part performance and equitable estoppel as applied in Tennessee to the statute of frauds. The resulting confusion in this state is compounded by the fact that the rules of part performance and equitable estoppel logically must apply differently in different sections of the statute. That is because of the functions served by the different provisions of the statute and the manner in which the remedial doctrines supplant them. The problem is that Tennessee courts have applied these doctrines even where there was no meaningful link to the functions for which they should substitute. Because most of these decisions reached results that are intuitively correct, and in fact could have been decided logically with the same result, the law governing the statute of frauds and its

exceptions has not faced serious challenge even though it is confused and conflicting.

England first passed the statute of frauds in 1677 to avoid those "many fraudulent practices, which are commonly endeavored to be upheld by perjury and subornation of perjury."[4] The statute has changed little since then, and Tennessee's is in the mainstream.[5] Its original purpose was evidentiary, for it served as a reliable way to prove the terms of an agreement.[6] Most of its provisions serve this purpose to some extent, and some of them serve other purposes as well. For example, the suretyship provision serves an important cautionary function, and the land contract provision serves a channeling function by providing a bright line test of enforceability.[7] Tennessee long ago recognized the evidentiary purpose of the requirement of a writing.[8]

---

**4.** These words are from the introductory clause of the statute. See E. Allan Farnsworth, *Contracts* § 6.1 at 370 (1982) [hereinafter *Farnsworth* ].

**5.** Tennessee's Statute of Frauds is codified at Tenn.Code.Ann. § 29–2–101 (Supp.1992):

> **Writing required for action.**—(a) No action shall be brought:
> (1) Whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate;
> (2) Whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person;
> (3) Whereby to charge any person upon any agreement made upon consideration of marriage;
> (4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year; or,
> (5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making thereof;
> unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized.
> (b)(1) No action shall be brought against a lender or creditor upon any promise or commitment to lend money or to extend credit, or upon any promise or commitment to alter, amend, renew, extend or otherwise modify or supplement any written promise, agreement or commitment to lend money or extend credit, unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the lender or creditor, or some other person by him thereunto lawfully authorized.
> (2) A promise or commitment described in subdivision (b)(1) need not be signed by the lender or creditor, if such promise or commitment is in the form of a promissory note or other writing that describes the credit or loan and that by its terms:
> (A) Is intended by the parties to be signed by the debtor but not by the lender or creditor;
> (B) Has actually been signed by the debtor; and
> (C) Delivery of which has been accepted by the lender or creditor.

**6.** *See* Farnsworth § 6.1 at 340:

> With the development of the action of general assumpsit by the beginning of the seventeenth century, informal contracts had become generally enforceable. In contrast to formal contracts, such as those under seal, informal contracts might be oral. However, trial of an action based on an oral contract raised problems: parties were not permitted to testify, jurors might rely on their own knowledge of the facts, and judges had no effective mechanism to control arbitrary jury verdicts. These circumstances tempted plaintiffs to procure false testimony....

In *Cobble v. Langford*, 230 S.W.2d 194 (Tenn. 1950), the court quoted an English case with approval:

> The meaning of the statute is to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other, and, therefore, both in this court and in the courts of the common law, where an agreement has been reduced to such a certainty, and the substance of the statute has been complied with in the material part, the forms have never been insisted upon.

*Id.* at 196.

Now that many of those original factors are no longer so problematic, the statute is less important in ensuring evidentiary reliability. Consequently, "it has been the subject of constant erosion." *Farnsworth* § 6.1 at 373.

**7.** *Id.* at 372.

**8.** On the sufficiency of the writing, the Tennessee Supreme Court has held: "The statute of frauds is, after all, merely a statute declaring that a certain kind of evidence is required to support an action in certain cases. If the statute be not pleaded, a parol contract can be enforced." *Huffine v. McCampbell*, 149 Tenn. 47, 257 S.W. 80, 88 (1923).

That court also quoted a South Carolina case with approval: "[A] letter written for the express purpose of repudiating the parol contract may constitute a sufficient memorandum." *Louisville*

The provision at issue in this case—the one-year provision—is difficult to classify; it serves none of the possible functions well. The evidentiary function is not well served because this provision is not applied so as to maximize its evidentiary reliability.

> If the one-year provision is based on the tendency of memory to fail and of evidence to go stale with the passage of time, it is ill-contrived, because the one-year period does not run from the making of the contract to the proof of the making, but from the making of the contract to the completion of performance. If an oral contract that cannot be performed within a year is broken the day after its making, the provision applies though the terms of the contract are fresh in the minds of the parties. But if an oral contract that can be performed within a year is broken and suit is not brought until nearly six years (the usual statute of limitations for contract actions) after the breach, the provision does not apply, even though the terms of the contract are no longer fresh in the minds of the parties.

*Farnsworth* § 6.4 at 391 (footnotes omitted).

Similarly, the one-year provision fails to serve the channeling and cautionary functions because it does not distinguish between significant and insignificant promises:

> If the one-year provision is an attempt to separate significant contracts of long duration, for which writings should be required, from less significant contracts of short duration, for which writings are unnecessary, it is equally ill-contrived because the one-year period does not run from the commencement of performance to the completion of performance, but from the making of the contract to the completion of performance. If an oral contract to work for one day, 13 months from now, is broken, the provision applies, even though the duration of performance is only one day. But if an oral contract to work for a year beginning today is broken, the provision does not apply, even though the duration of performance is a full year.

*Id.* (footnotes omitted).

■ Because the one-year provision has been particularly difficult to rationalize, Tennessee courts have been hostile to it, construing it extremely narrowly, and this court is bound to do so as well.[9] In particular, they have held the words "not to be performed" to mean "not performable." Therefore, if the contract is at all capable of performance within a year, the provision will not apply.[10] This might be true even though the parties did not actually contemplate that the contract would be performed within the year.[11] The initial test, however, is whether *by its terms*

*Asphalt Varnish Co. v. Lorick,* 29 S.C. 533, 8 S.E. 8 (1888).

9. Tennessee courts carried over the English tendency to construe the statute narrowly. *See, e.g., Taylor & Williams v. Ross,* 11 Tenn. (3 Yer.) 330, 332 (1832), where in construing the suretyship provision the court held:

> [I]t is not necessary, where the promise to pay the debt of another is in writing, that the consideration of the promise should also be stated in writing, in order to maintain an action. By the common law, the promise and the consideration both might have been proved by parol. By the act of 1801, ch. 25, the common law is changed but it is changed no further than the legislature has expressly declared; that declaration extends only to the promise [as opposed to the "agreement," which comprises both "promise" and "consideration"]; consequently, the consideration may be proved as at common law.

10. An early statement of this rule in Tennessee is found at *Deaton v. Tennessee Coal and Railroad Company,* 59 Tenn. (12 Heisk.) 650, 653 (1874):

> It is the settled construction of this provision of the statute, that if the executory promise be capable of entire performance within one year, it is not within this clause.... If when made it was in reality capable of a full and bona fide performance within the year, without the intervention of extraordinary circumstances, then it is to be considered as not within the statute. *See also Radiophone Broadcasting Station v. Imboden,* 191 S.W.2d 535 (Tenn.1946); *Price v. Mercury Supply Company,* 682 S.W.2d 924 (Tenn. Ct.App.1984); *McDade v. McDade,* 45 Tenn.App. 487, 325 S.W.2d 575 (1958); *Clark v. Hefley,* 238 S.W.2d 513 (Tenn.Ct.App.1950); *Boutwell v. Lewis Bros. Lumber Co.,* 27 Tenn.App. 460, 182 S.W.2d 1 (1944).

11. *See Swain v. Harmount & Woolf Tie Co.,* 226 Ky. 823, 11 S.W.2d 940 (1928) (contract to cut over 2,000,000 board-feet of timber could have been performed within a year if logger had hired enough extra men); *contra: Cumberland & M.R. Co. v. Posey,* 196 Ky. 379, 244 S.W. 770 (1922) (although railroad could have been completed within a year, "no such result was contemplated by the parties").

the agreement provides that the contract could or could not be performed within a year. By no reasonable interpretation of the agreement between Wright and Talkington could the contract in this case be fully performed within one year. Part VI of the draft memorandum provides:

 Commencing June 30, 1983, [as corrected by Talkington] or one month after Employee ceases to be employed by Employer, whichever date is later, Employer will pay an amount equal to $1000 multiplied by the number of full months of Employee's employment under this agreement (a maximum of 60 months) as follows: Monthly installments of $1000 to Employee until full payment of such amount or Employee's death, whichever first occurs; and if Employee dies before full payment of such amount, monthly installments of $1000 to his widow until full payment of such amount or until his widow's death, whichever first occurs; or if both Employee and his widow should die before full payment of such amount (or if Employee should die leaving no widow), a single payment of the balance of such amount to the Employee's estate.

The one-year provision applies to this contract because by its terms the employer would under no circumstances commence deferred compensation payments before June 30, 1983, five years after Talkington was employed under this agreement. Therefore, if this contract is to be enforced it will be because of an exception to the statute of frauds. In Tennessee, this has been done by applying the doctrines of part performance and equitable estoppel.

The part performance doctrine evolved from the sales provision, in which the evidentiary function of the statute is most directly served. The Statute of 1677 expressly provided for satisfaction not only by a memorandum, but also by part performance.[12] This provision is now codified in Tennessee's version of the Uniform Commercial Code.[13] The rationale for this exception is easy to understand. If the purpose of a writing is to provide good evidence of the terms of a contract, then surely the terms upon which the contract has already been partly performed prove the terms of the agreement just as well. One would expect that the performance of the parties would indicate the terms to which they agreed. Therefore, the part performance serves the evidentiary function that prompted the need for the statute of frauds just as well as the writing requirement. In fact, the drafters of the code commented that "receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists."[14] The first paragraph of UCC 2-201, comment 2 is further evidence that part performance was intended as an evidentiary substitute for a writing:

"Partial performance" as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted.

Thus, in the sales provision, part performance quite naturally is evidence of the agreement only to the extent that it was performed. Nonetheless, courts have been willing to remove the contract from the statute entirely, once a part performance has

12. Section 17 provided that the agreement was enforceable without a writing if "the buyer shall accept part of the goods ... sold, and actually receive the same, or give something in earnest to bind the bargain, or in part of payment." Statute of Frauds, 1677, 29 Car. 2, c. 3, § 17 (Eng.).

13. Tenn.Code Ann. § 47–2–201 (1992):

Formal requirements—Statute of frauds.— (1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable:

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted.
(Cross references omitted).

14. UCC 2–201, cmt. 2.

been established, probably because they are confident of their ability to find the terms of the agreement the way they do in any other contract case not involving the statute. One early Tennessee case along these lines is *Ashley v. Preston*, 162 Tenn. 540, 39 S.W.2d 279 (1931). The parties had entered into an oral purchase-repurchase agreement. In 1928, the plaintiffs purchased cattle from the defendants with the understanding that the plaintiffs would graze them for one year. The defendants would then repurchase the cattle at an agreed price. In September of 1929, the defendants refused to repurchase, and the plaintiffs sued. The defendants raised the statute of frauds as a defense, seeking to avoid the contract, but the court held that their part performance of the contract took it out of the statute.

The problem is that the part performance gives proof of the terms of the contract only as far as the contract was performed. In this case, the plaintiffs performed their half of the contract; they purchased the cattle at 11¢ per pound plus $1 per head. Although it tends to show an agreement to purchase

cattle at 11¢ per pound plus $1 per head, it does nothing to prove the terms of the repurchase.

A consequence of the evidentiary substitute rationale is that part performance should have no effect on provisions which serve functions other than the evidentiary one. For instance, while the land sale provision serves an evidentiary function, it also serves a channeling function for which part performance cannot substitute. *Cobble v. Langford*, 190 Tenn. 385, 230 S.W.2d 194 (1950). Tennessee has generally not applied part performance in land cases.[15] The Tennessee courts which upheld land contracts on the grounds of part performance did so in cases in which the equities were very strongly in the plaintiff's favor or because the part performance was substantially on the part of the defendant, which is evidence of his assent to the terms of the agreement. In any event, though Tennessee land contract cases might have involved a part performance, most courts have not purported to rely on that to enforce the contract, but upon equitable estoppel.[16]

---

**15.** Some jurisdictions do apply what they call a part performance doctrine in cases involving the land contract provision, but only where there has been "performance 'unequivocally referable' to the agreement, performance which alone and without the aid of words of promise is unintelligible or at least extraordinary unless as an incident of ownership." *Burns v. McCormick*, 233 N.Y. 230, 135 N.E. 273 (1922) (Cardozo, Justice).

The "part performance doctrine" applied in these cases is significantly more limited in scope than that which evolved in connection with the sale of goods provision. *See* Farnsworth § 6.9. Moreover, the requirement of unequivocal reference to the agreement is best explained as a safety check, for the land contract cases have all required a measure of reliance unrelated to the origins of the part performance doctrine. *See, e.g., Buice v. Scruggs Equipment Co.*, 194 Tenn. 129, 250 S.W.2d 44 (1952), where for the first time the court referred to part performance as purely an equitable doctrine and infers that a reliance must be proved: "The acts of the appellant relied on as partial performance had been done by him in pursuance to the averred contract and agreement and are clearly referable thereto." *Id.* 250 S.W.2d at 48. Inexplicably, the court then quoted Am.Jur. for what had always been the definition of equitable estoppel: The plaintiff must be able to show such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not

avail himself of the statute to escape its performance; and also that the plaintiff, in reliance on this representation, has proceeded, either in performance or pursuance of his contract, so far to alter his position as to incur an unjust and unconscious injury and loss, in case the defendant is permitted after all to rely upon the statutory defense. *Buice*, 250 S.W.2d at 48 (quoting 49 Am.Jur. § 427 at 733).

Regardless of what Am.Jur. says, this has nothing to do with part performance. A representation to stand by his agreement and not avail himself of the statute had until *Buice* been explained as equitable estoppel. As explained later, it is best explained by a theory of detrimental reliance, or promissory estoppel. The confusion this case generates is caused partly because *Buice* did not involve a contract for the sale of land, yet it quoted an Am.Jur. section which attempted to explain what courts had done with "part performance" as it related to land contract cases. *Buice* applied the wrong "part performance" rule. Therefore, *Buice* should not be read as requiring proof of detrimental reliance in part performance cases, but *only* in land contract cases, where that has always been required anyway.

**16.** *See, e.g., Baliles v. Cities Service Co.*, 578 S.W.2d 621 (Tenn.1979) (where grantor placed grantee in possession of land, permitted him to improve it, and took affirmative steps to assist him in obtaining loan for further improvement,

■ Equitable estoppel, or estoppel in pais, was first of all a doctrine developed to protect three important equitable considerations:

1. A loss should be borne by the one who causes it.

2. No one should be allowed to profit from his own wrong.

3. One may not to his advantage contradict his own former conduct.

When someone misleads another who relies on this misrepresentation to his detriment, the misleading party will not be allowed to show that the true facts are contrary to what he first asserted.[17] Estoppel in pais [18] is traditionally defined as

> [t]he species of estoppel which equity puts upon a person who has made a false representation or concealment of material facts, with knowledge of the facts, to a party ignorant of the truth of the matter, with the intention that the other party should act on it, and with the result that such party is actually induced to act upon it to his damage.

Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343, 376 n. 182 (1969).

■ Thus, the doctrine of equitable estoppel as it has developed in Tennessee is available where the defendant has misrepresented either his intention to produce a signed writing, that a signed writing has been produced, or his intention not to rely on the statute. The first and last of these instances are better explained as involving promissory estoppel, for they involve not so much a representation of established fact, but an assurance of future conduct—a promise.[19] In this case, there are two ways Wright misrepresented the facts. When Talkington approached him requesting a written agreement, he misrepresented his intention to prepare and sign a written memorandum. He should not later be allowed to assert that he had no such intention because Talkington relied on this representation; he worked with Clear Creek for months while he awaited the memorandum. Also, when Wright, speaking for the corporation, later stated "you have my word on it anyway," he implied that he did not intend to rely on the statute of frauds as a defense; he would honor their oral agreement. This was a misrepresentation of the corporation's intention not to rely on the statute.[20] Talkington reasonably relied on

doctrine of equitable estoppel prevented grantor from raising defense of statute of frauds).

17. *See* H. Gibson, *Gibson's Suits in Chancery* § 91 (7th ed. 1988). There Gibson draws from *Duke v. Hopper*, 486 S.W.2d 744, 748 (Tenn.App. 1972):

> Estoppel in pais is an estoppel that does not arise from a record or written instrument, but arises from the conduct or silence of a party and is sometimes referred to as equitable estoppel. In the true sense, all matters of estoppel arise in equity, for the purpose of the existence of the doctrine is to prevent inconsistency and fraud resulting in an injustice. When a man has been misled by the untruth propounded by another, and acted to his detriment in reliance upon the misrepresentation, the misleading party will be estopped to show that the true facts are contrary to those he first propounded. In the words of Lord Coke, this is so "because a man's owne act or acceptance stoppeth, or closeth up his mouth to alleage or plead the truth."

18. A matter *in pais* signifies a matter of fact, probably because matters of fact are triable by the country, i.e., by jury. Pais or pays is from the French for "the country," or "the neighbor-

hood." Black's Law Dictionary 1110 (6th ed. 1990).

19. The defendant suggests that promissory estoppel would be inapplicable here anyway because there is no allegation of a lack of consideration. This makes no sense. Lack of consideration is not an element of promissory estoppel; it is a requirement of a valid contract. Its absence simply precludes a remedy on the contract. Promissory estoppel protects a party's reliance interest, so the party need only prove reasonable reliance on some promise. In statute of fraud cases, the lack of a writing is no less rational a trigger for applying promissory estoppel than is the lack or failure of consideration, as long as the promise relied upon was related to the writing. Several jurisdictions have expressly applied promissory estoppel in these situations. The leading case is *Alaska Airlines, Inc. v. Stephenson*, 15 Alaska 272, 217 F.2d 295 (9th Cir.1954). *See Also* J. Calamari and J. Perillo, *Contracts* § 19–48 at 843 n. 68 (3d ed. 1987) (listing cases).

20. For a discussion of the grounds on which estoppel is available in cases involving the statute of frauds, *see* Farnsworth § 6.12 (1982) (citing cases).

this statement because the alternative was to antagonize the man who was in control of the entire corporate structure. This would damage their friendship and mutual respect and put a strain on their business relationship. Accordingly, he ceased his efforts to obtain a signed writing, which is precisely what Wright intended by his statement "you have my word on it anyway." Taking Wright at his word, Talkington continued to work for Clear Creek according to the terms he and Wright had agreed on and made no efforts to participate in the company's regular deferred compensation plan.

■ An alternative reason to enforce their agreement is part performance of the contract. Both parties performed the contract according to their agreement for a period of 33 months. During that time, Talkington provided his uniquely skilled services to Clear Creek, and Clear Creek paid him the salary he and Wright had agreed upon. Talkington was a valuable asset to Joe Wright, and this court has no difficulty finding that Wright bargained for and obtained Talkington's services precisely as they had agreed. Accordingly, the agreement is removed from the one-year provision. However, this contract was performed according to its terms only until Talkington went out on his own with Talkington Mining Corporation. From that time on, Talkington no longer performed according to the 1978 agreement; consequently, Clear Creek owes Talkington only 33 months' worth of deferred compensation.[21]

## B. Instrumentality.

The draft memorandum Raynolds sent in October 1978 identified Talkington as the employee and Clear Creek as the employer. For 10½ years, Talkington was employed by and received salary payments from Clear Creek. Talkington names Anchor Gas as a defendant and seeks to pierce the corporate veil by alleging that Clear Creek, its subsidiary, is a mere instrumentality for Anchor Gas.

■■ A subsidiary corporation has an existence separate and distinct from that of the owners or its parent corporation, but the separate entity may be disregarded only upon a showing of special circumstances such as that the corporation is a puppet, sham, or dummy, so that the failure to disregard it would result in an injustice. Electric Power Bd. v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522 (Tenn.1985). Three elements are required to invoke the instrumentality rule:

1. At the time of the transaction, the parent must exercise complete dominion and control over its subsidiary in finances, policy, and business practice, so that the entity has no separate mind, will, or existence of its own;

2. The control must be used for wrong, fraud, or an unjust act in contravention of third party rights; and

3. The control and breach of duty must proximately cause the injury or unjust loss.

■ Although Anchor Gas claims that Talkington must prove fraud in order to use the instrumentality rule, Tennessee cases do not impose that requirement. Fraud is one possible avenue of recovery, but Tennessee allows recovery for "injury," violation of legal duty, dishonest act, or injustice.[22] The evidence shows that the first element of this

21. Talkington's earnings from TMC were substantial, as the following table shows.

| Year | Harry Talkington | Dorothy Talkington |
| --- | --- | --- |
| 1982 | $34,100 | $11,900 |
| 1983 | 6,975 | 5,250 |
| 1984 | ——— | 16,750 |
| 1985 | 43,800 | 26,000 |
| 1986 | 48,000 | 26,000 |
| 1987 | 78,000 | 26,000 |
| 1988 | 81,000 | 27,000 |

22. See Stigall v. Wickes Machinery, Div. of Wickes Corp., 801 S.W.2d 507, 511 (Tenn.1990) (corporate citizens have right to conduct business as a corporation "unless it can be shown to the contrary that the corporate structure is an artifice created for the purpose of committing fraud or injury upon the complaining victim"); Electric Power Bd. v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn.1985) and Continental Bankers Life Ins. Co. v. Bank of Alamo, 578 S.W.2d 625, 632 (Tenn.1979) (to pierce veil, must show that parent used control in order to perpetuate violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of third party rights); and United States v. Daugherty, 599 F.Supp. 671, 676 (E.D.Tenn. 1984) (fraud or other improper purpose).

rule is easily met. Anchor Gas provided all funds necessary to keep Clear Creek in existence. After Clear Creek was acquired in 1970, it never again obtained financing from a bank. All funds came from Anchor Gas and at the time of its administrative dissolution, Clear Creek owed Anchor Gas $2.7 million. Anchor Gas, Anchor Coal, and Clear Creek had interlocking directorates and officers. The individuals who made decisions for all three corporations were all the same. Anchor Gas provided all legal and accounting services for Clear Creek. Anchor Gas and its subsidiaries filed consolidated tax returns and Anchor Gas obtained the tax benefits of Clear Creek's losses. It was Anchor Gas's decision to close down Clear Creek, sell its equipment, parts, and inventory, and apply the proceeds of the sale to its own account, and then to dissolve it. Anchor Gas made the decision not to commit to Talkington's salary after November 1988. In particular, corporate formalities were essentially laughed at. In fact, the whole business was run much like a "mom & pop" corner grocery store, with minutes rarely kept and board action taken long after corporate action, if ever.[23] The only rational conclusion is that Anchor Gas so controlled the finances, policies, and business practices of Clear Creek that it had no separate mind, will, or existence of its own.

Talkington also meets the second and third elements of the rule. The evidence shows that his agreement with Wright, who controlled the entire corporate enterprise, would have provided for his retirement benefits. Consequently, Talkington did not avail himself of the existing retirement plan. Now that the parent corporation is refusing to pay his deferred compensation, their action is the proximate cause of his loss.

The court holds that this is a case in which it is proper to pierce the corporate veil. For years Anchor Gas conducted its business through Wright, usually invoking corporate formality long after he had made the personal decision to act. In Talkington's case, An-

chor Gas availed itself of the benefit of his services on a loose, informal basis the whole time he was with Clear Creek. All decisions were checked with Wright, usually with no corporate action. For Anchor Gas now to benefit from its corporate status shows that it is merely a technical convenience. It has a history of raising and dropping the corporate shield whenever it is most profitable. The only way to prevent injustice against Talkington is to pierce the corporate veil.

## C. Damages.

█ Anchor Gas argues that Talkington may recover only the amounts which have already become due. They state the general rule that "contracts to pay money in installments are breached one installment at a time." *Quick v. American Steel & Pump Corp.*, 397 F.2d 561, 564 (2d Cir.1968). Ordinarily, only an acceleration provision changes this result.

The rule of *Quick* is more often stated as an exception to the general rule of breach by anticipatory repudiation, which, like breach by nonperformance, discharges any remaining duties of performance by the injured party and gives him an immediate action for damages for total breach. *Roehm v. Horst*, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953 (1900).[24] Criticism of this doctrine has resulted in a major exception:

> Repudiation of a duty does not operate as a breach if it occurs after the repudiating party has received all of the agreed exchange for that duty. The injured party must then await the time for performance to sue for damages. Thus courts have refused to apply the doctrine when a party repudiates either a unilateral contract or a bilateral contract that has been fully performed by the injured party.

Farnsworth § 8.20 at 630.

However, the exception itself has limitations, as it should, considering that attempts

---

23. For instance, in the entire 10½ years Talkington worked at Clear Creek, no board of any of the companies took any formal action concerning his salary; the only record of his salary was obtained from the employee payroll register.

24. The first case to reach this holding is *Hochster v. De la Tour*, 2 El. & Bl. 678, 118 Eng.Rep. 922 (Q.B.1853).

to rationalize it are unconvincing.[25] The argument goes that since the complaining party has no contractual rights or duties at stake, he is not prejudiced by simply having to await the breaching party's nonperformance. Of course, this argument fails in the case of one who has an unconditional obligation to make installment payments, because the plaintiff would in fact be prejudiced by having to resort to judicial process to enforce each payment. This is especially unacceptable in Tennessee because this state has a long standing policy of avoiding a multiplicity of lawsuits. *Barnes v. Black Diamond Coal Co.*, 101 Tenn. 354, 47 S.W. 498, 500 (1898).

Whether the obligation to make the installments is conditional is an important distinction; it is the point on which the rationale for the exception fails, and also the point which distinguishes between two lines of federal cases that involve present breach accompanied by a repudiation. In all of these cases, the injured party had completely performed his contractual obligations. If the obligation to make payments in the future depends upon a condition the recipient must satisfy[26] (even though not by the performance of a duty), then the federal rule is that the plaintiff has no present action for damages for total breach.[27]

If on the other hand the plaintiff claims "not a right to future payments contingent on a continuation of present status, but a basic right to receive unconditional payments," then the action is one for damages for total breach, despite the fact that the plaintiff has fully performed under the contract.[28] In *Aetna Casualty & Surety Co. v. Flowers*,[29] a widow sought to enforce her right to install-

ment payments of Tennessee Workmen's Compensation death benefits. The Court held that "the Tennessee statute which creates liability for the award contemplates a single action for the determination of claimant's right to benefits and a single judgment for the award granted."[30]

■ This case is similar. The parties here contemplated that the duration of Talkington's employment would define the amount of deferred compensation due him. When he ceased performing under the terms of his agreement with Wright, Anchor Gasoline's obligation fully ripened, and no action or inaction on his part, not even his death, would alter the obligation of $33,000. Their obligation is unconditional. Talkington alleges (and Anchor Gas denies) a basic right to payment of the entire amount. Therefore, as in *Flowers*, there can be but "a single action for the determination of claimant's right ... and a single action for the award granted." Furthermore, if this court refused jurisdiction over the entire amount, it would needlessly encourage a multiplicity of lawsuits as Talkington returned to court repeatedly to force payment, and this would go against the stated judicial policy of Tennessee.

## III. CONCLUSION

Talkington formally demanded payment of deferred compensation on 2 October 1990, effective that month. As the court holds that Anchor Gas is liable for payments totalling $33,000 in $1000 monthly installments, 31 payments are past due. The court therefore will award Talkington $31,000 plus interest, and will order Anchor Gas to make two more

**25.** Texas does not apply this exception. *Pitts v. Wetzel*, 498 S.W.2d 27 (Tex.Civ.App.1973).

**26.** The most often litigated cases involve disability benefits, so the most common example is continued physical impairment.

**27.** *See, e.g., New York Life Insurance Co. v. Viglas*, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971 (1936) (leading case); *Mobley v. New York Life Insurance Co.*, 295 U.S. 632, 55 S.Ct. 876, 79 L.Ed. 1621 (1935); *Beaman v. Pacific Mutual Life Insurance Company*, 369 F.2d 653 (4th Cir.1966). The only Sixth Circuit case on this point held to the contrary, *Federal Life Insurance Co. v. Ras-*

coe, 12 F.2d 693 (6th Cir.1926), but the Supreme Court expressly disapproved *Rascoe* in both *Mobley* and *Viglas*.

**28.** *Beaman*, 369 F.2d at 655. The principal case is *Thompson v. Thompson*, 226 U.S. 551, 33 S.Ct. 129, 57 L.Ed. 347 (1913). *See also Aetna Casualty & Surety Co. v. Flowers*, 330 U.S. 464, 67 S.Ct. 798, 91 L.Ed. 1024 (1947); *Brotherhood of Locomotive Firemen & Enginemen v. Pinkston*, 293 U.S. 96, 55 S.Ct. 1, 79 L.Ed. 219 (1934).

**29.** 330 U.S. 464, 67 S.Ct. 798.

**30.** *Id.* at 467, 67 S.Ct. at 799.

monthly payments on 1 June 1993 and 1 July 1993.