804 F.2d 435
 21 Fed. R. Evid. Serv. 1262
 Paul BECKMAN, guardian of Phyllis Beckman, an incompetent, Appellant,
v.
MAYO FOUNDATION, a non-profit corporation, Robert C.
Hermann, M.D., Dennis G. Gruwell, M.D., and Earl
T. Carter, M.D., Appellees.
 No. 85-5369.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 9, 1986.
Decided Oct. 28, 1986.
 
 1
 Lester F. Murphy, East Chicago, Ind., for appellant.
 
 
 2
 James H. O'Hagan, Minneapolis, Minn., for appellees.
 
 
 3
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and REGAN*, Senior District Judge.
 
 
 4
 REGAN, Senior District Judge.
 
 
 5
 After a trial to a jury, plaintiff Paul Beckman, as guardian of Phyllis Beckman, appeals from the judgment of the jury that the plaintiff did not prove by a preponderance of the evidence that the defendants were negligent. We affirm the judgment in the district court.
 
 
 6
 Phyllis Beckman attended the Mayo Clinic on December 30, 1975, complaining of headaches of a varied severity which had been bothering her during the previous month. Mrs. Beckman expressed her concern that she might have a brain tumor. She was examined on January 6, 1976 by Dr. Hermann, a neurologist at the Mayo clinic. Dr. Hermann conducted a standard neurological examination, during which he reviewed Mrs. Beckman's medical history with her, observed her movement and speech, and evaluated her vision, ocular and facial movement, muscle strength, reflexes, and mental status. Additionally, Mrs. Beckman had been given a skull x-ray, an electroencephalogram (EEG) which measures the electrical activity within the brain and an echencephalogram which is an ultrasound test designed to detect abnormalities within the brain. The results of these tests were normal.
 
 
 7
 Dr. Hermann informed Mrs. Beckman that she was in all likelihood suffering from tension headaches, and that the normal test results showed that it was extremely unlikely that she had a brain tumor. However, he informed Mrs. Beckman that his diagnosis could be more certain if she were to undergo a CAT scan, a computerized x-ray device which prints out a picture display of the brain and surrounding tissue. He explained to her that there were slight risks inherent in the administration of a CAT scan: the risk of an allergic reaction to the dye used during the test and the risk caused by the radiation involved. Despite Dr. Hermann's advice that "the CAT scan would be the best way to go", Mrs. Beckman was concerned about the risk of radiation and elected not to have the CAT scan. Dr. Hermann prescribed medication for Mrs. Beckman and advised her to discontinue the medication that she had previously been taking. Dr. Hermann's diagnosis and offer of a CAT scan were documented in the Mayo Clinic records.
 
 
 8
 Mrs. Beckman returned to the Mayo Clinic in 1978 seeking treatment for unrelated medical problems. She said during that visit that she was no longer bothered by headaches.
 
 
 9
 Mrs. Beckman returned to the Mayo Clinic in March of 1981 complaining of severe headaches which she thought were caused by sinus trouble. She would also occasionally see sawtooth black lines in the left area of vision in both eyes and have tremors in her right hand. After an examination, no evidence of sinus disease was found.
 
 
 10
 Mrs. Beckman was further examined at the Mayo Clinic on June 16, 1981, by Dr. Gruwell, a resident in internal medicine. He reviewed her medical history and current problems. He then performed a physical examination on her, including a neurologic examination. He found nothing wrong with her neurologically. Dr. Gruwell told Mrs. Beckman that he thought her headaches were due to tension but offered a CAT scan to her for further assurance. Based on that information, she did not undergo a CAT scan.
 
 
 11
 Mrs. Beckman was sent to the Neurology Department of the Mayo Clinic on June 18, 1981, for further evaluation. She was examined by Dr. Hermann who had examined her in 1976. She told Dr. Hermann that her headaches had resumed in September of 1980 and that they were caused by tension. She also told him about her vision problems and the hand tremors. He reviewed her medical history and conducted a neurologic examination. He found no abnormal conditions. Mrs. Beckman was also given an EEG and a skull x-ray. Although the results of the EEG were slightly different from the results of her 1976 EEG, Dr. Hermann explained that the changes were clinically insignificant. The results of the skull x-ray were also normal.
 
 
 12
 Dr. Hermann discussed the results of his examination and the diagnostic procedures with Mrs. Beckman. He again explained that the results showed that it was very unlikely that she had a brain tumor. He also told her that the improvement in her headaches between 1976 and 1981 was inconsistent with brain-tumor headaches. However, he again explained that a CAT scan was the best method to rule out a brain tumor. He also again explained the risks inherent in the CAT scan. Mrs. Beckman declined the CAT scan due to her concern about the risk of the radiation.
 
 
 13
 After a consultation with Dr. Carter, Dr. Gruwell wrote a letter to Mrs. Beckman summarizing her June 1981 examinations at the Mayo Clinic. Dr. Gruwell told Mrs. Beckman that Dr. Hermann thought that her headaches were not of a dangerous nature. Dr. Gruwell also stated that he thought her headaches were due to depression and suggested that she seek professional counseling and return to the Mayo Clinic in one year. The offers of a CAT scan were not recorded in the Mayo Clinic records.
 
 
 14
 On March 15, 1982, Mrs. Beckman's family could not awaken her. She was taken to St. Margaret Hospital in Hammond, Indiana in a semi-comatose state. She was given a CAT scan which revealed a large meningioma, a tumor of the meninges which is the membrane surrounding the brain. Although the meningioma was surgically removed, Mrs. Beckman now suffers from significant impairments.
 
 
 15
 Mr. Beckman, as guardian for Mrs. Beckman, brought this suit against the Mayo Foundation, Dr. Hermann, Dr. Gruwell, and Dr. Carter for negligence in failing to recommend a CAT scan to Mrs. Beckman, making a final diagnosis of her without performing a CAT scan which resulted in their failure to detect the meningioma and failing to record their offers of a CAT scan in June of 1981. At a trial before a jury, both parties presented expert testimony as to whether or not the defendant had committed negligence in their diagnosis or treatment of Mrs. Beckman and whether or not her impairments were caused by the meningioma. The jury found that the defendants were not negligent and thus did not reach the issue of causation.
 
 
 16
 Plaintiff appeals contending that the district court erred in that it: 1) refused to make Dr. Hermann answer crucial questions; 2) failed to give some of plaintiff's submitted jury instructions; 3) failed to grant a new trial because the jury's finding was against the weight of the evidence; and 4) failed to grant a judgment notwithstanding the verdict on the issue of liability.
 
 
 17
 The district court has discretion to control the extent of examination and cross-examination of witnesses. Skogen v. Dow Chemical Co., 375 F.2d 692, 704 (8th Cir.1967). Rule 611(a) of the Federal Rules of Evidence states that the district court should " * * * exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." In the instant case, defendant Dr. Herman had testified extensively as to his discussion with Mrs. Beckman during her examination on June 18, 1981. He stated in detail what he had told her about the results of her tests and what additional benefit could be gained from a CAT scan. He also testified that, based on the events of June 18, 1981, his diagnosis and treatment of Mrs. Beckman had complied with the standard of care of a reasonably careful neurologist under the circumstances. The district court did not abuse its discretion in denying plaintiff's request that Dr. Hermann be required to answer cumulative questions about these subjects.
 
 
 18
 Plaintiff's next assignment of error is the failure of the district court to give plaintiff's proposed instruction on defendants' burden of proof and defendants' standard of care. In order to review the instruction for error, the party asserting the error must have made an objection to the instructions to the district court. Plaintiff made no objections to the instructions to the district court.
 
 
 19
 Rule 51 of the Federal Rules of Civil Procedure states that:
 
 
 20
 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
 
 
 21
 This court has required a proper objection to an error in jury instructions to preserve such error for appeal. Dehues v. Western Elec. Co., 710 F.2d 1344, 1346 (8th Cir.1983). A general objection to the failure to give proposed instructions may suffice to preserve the alleged error. Monahan v. Flannery, 755 F.2d 678, 683 (8th Cir.1985). However, any error in instructions not properly objected to is waived unless it is plain error that resulted in a miscarriage of justice. Dehues at 1346.
 
 
 22
 In the instant case, the district court informed the parties of the instructions that would be given to the jury the following day. The district court also informed the parties that all other proposed instructions would not be given. Although memorandums of law in support of these proposed instructions had been filed by the plaintiff, he made no objections to the court's refusal to give some of his instructions.
 
 
 23
 After the district court had instructed the jury, the parties were told by the court that they could point out any errors or misstatements and make objections to any instructions which were given or to the failure to give any instructions which were requested. Again, the plaintiff made no objections. Because no objections were made by the plaintiff, the district court's judgment can only be reversed if there was plain error in the instructions given that resulted in a miscarriage of justice.
 
 
 24
 When reviewing instructions for plain error, this court has stated that the district court has discretion in the style and wording of jury instructions so long as the charge as a whole fairly and adequately states the law. Circle J Dairy v. A.O. Smith Harvestore Products, 790 F.2d 694, 698 (8th Cir.1986). In the instant case, there was extensive evidence presented at trial as to whether the defendants were negligent in their diagnosis or treatment of Mrs. Beckman. The district court instructed the jury that the plaintiff had the burden of proving that the defendants were negligent by a preponderance of the evidence. The district court then gave these instructions as to what is negligence:
 
 
 25
 Now we come to what might well be called the heart of the lawsuit, the principal claim of the plaintiffs, that is negligence. Fault. Medical malpractice. Those terms might be almost synonymous for our purposes here. The term "medical malpractice" is negligence as applied to the medical profession.
 
 
 26
 First I define "negligence" for you. "Negligence" is the failure to use reasonable care, such care as a person of ordinary prudence would exercise under the same or similar circumstances.
 
 
 27
 Reasonable care in this case is that care which a reasonable doctor would use under like circumstances.
 
 
 28
 An alternate definition of "negligence" is that: "Negligence" is the doing of something which a reasonable doctor would not do or the failure to do something which a reasonable doctor would do under like circumstances.
 
 
 29
 Negligence.
 
 
 30
 Now, a little more specifically on this doctrine of negligence as it applies to medical malpractice. I advise you that the law is that: A doctor has a legal duty to his patients. Failure to perform that duty is negligence or medical malpractice.
 
 
 31
 And here's the heart of the instruction: In performing professional services for a patient, a doctor must use that degree of skill and learning which is normally possessed and used by doctors in good standing in similar practice and under like circumstances. Thus, a specialist is held to the standards of a specialist in his field. In the application of the required skill and learning, the doctor must use reasonable care.
 
 
 32
 The fact, standing alone, that a good result may not have followed from the treatment by the defendants is not evidence of negligence or unskilled treatment. A doctor is not a guarantor of a diagnosis or a good result from his treatment.
 
 
 33
 When there is more than one method of treatment or diagnosis that is in accordance with recognized medical authority and good current practice, a doctor is not responsible for an honest error in judgment in choosing between one of the accepted methods of treatment or in choosing between accepted diagnosis.
 
 
 34
 I'll state for you again that one-sentence statement about the responsibility of a doctor: In performing professional services for a patient, a doctor must use that degree of skill and learning which is normally possessed and used by doctors in good standing in similar practice and under like circumstances.
 
 
 35
 So, in answer to Question Number 2(a), make your judgment: Has the plaintiff shown by the greater weight of the evidence that these doctors were negligent, that they committed medical malpractice?
 
 
 36
 We have much evidence on that and much expert opinion on that, and the lawyers discussed that issue with you pro and con.
 
 
 37
 These instructions were a proper statement of Minnesota law on the negligence of doctors. See Kinning v. Nelson, 281 N.W.2d 849 (Minn.1979). These instructions along with the others given by the district court, when viewed as a whole, did not contain plain error.
 
 
 38
 The district court has discretion to grant or deny a new trial based on its reading of the evidence. McGee v. South Pemiscot School Dist. R-V, 712 F.2d 339, 344 (8th Cir.1983). However, the trial court cannot usurp the functions of a jury. The district court can only disturb a jury verdict to prevent a miscarriage of justice. See id. at 344. The verdict must be against the "clear weight", "overwhelming weight", or "great weight", of the evidence for a new trial to be granted. Goldsmith v. Diamond Shamrock Corp., 767 F.2d 411, 416 (8th Cir.1985).
 
 
 39
 In the instant case, there was much conflicting evidence as to whether the defendants were negligent in their diagnosis or treatment of Mrs. Beckman. Plaintiff's expert witnesses presented evidence that the defendants were negligent in that they: 1) should have recommended a CAT scan to Mrs. Beckman; 2) should have refrained from rendering a final diagnosis without a CAT scan; and 3) should have recorded their 1981 offers of a CAT scan. Defendants and their expert witness presented evidence that: 1) the standard of care called for the defendants to offer Mrs. Beckman a CAT scan; 2) they twice offered Mrs. Beckman a CAT scan in June of 1981; and 3) they could make a final diagnosis without the CAT scan. Thus, the jury's determination that the defendants were not negligent was not clearly against the weight of the evidence. The district court did not abuse its discretion by denying the plaintiff's motion for a new trial.
 
 
 40
 When reviewing a district court's denial of a motion for a judgment notwithstanding the verdict (JNOV) we must:
 
 
 41
 (1) consider the evidence in the light most favorable to the defendants as the parties prevailing with the jury;
 
 
 42
 (2) assume that all conflicts in the evidence were resolved by the jury in favor of the defendants;
 
 
 43
 (3) assume as proved all facts which defendants' evidence tends to prove(4) give the defendants the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and
 
 
 44
 (5) deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusions to be drawn from it.
 
 
 45
 Thomas v. Booker, 784 F.2d 299, 305 (8th Cir.1986), cert. denied, --- U.S. ----, 106 S.Ct. 1975-76, 90 L.Ed.2d 659 (1986).
 
 
 46
 In the instant case, there was ample evidence presented by the defendants and a non-defendant doctor which showed that the defendants were not negligent in their diagnosis or treatment of Mrs. Beckman. Thus, under the strict standard of review, we cannot find that the district court erred in denying plaintiff's motion for a JNOV.
 
 
 47
 We have concluded that the district court did not abuse its discretion in denying plaintiff's request that defendant Dr. Hermann answer cumulative questions. We have also concluded that the trial court's instructions to the jury did not include plain error. We have also concluded that the district court properly denied plaintiff's motions for a new trial and a JNOV.
 
 
 48
 Accordingly, the district court's judgment for the defendants is affirmed.
 
 
 
 *
 The HONORABLE JOHN K. REGAN, Senior United States District Judge for the Eastern District of Missouri, sitting by designation