**FIRST STATE BANK OF FLOODWOOD,** Floodwood Agency, Inc., John F. Schill-ing, William J. Gravelle, Joseph Bullyan and Eugene J. Stowell, **Plaintiffs,**

v.

Jerry J. **JUBIE,** Irene M. Jubie, Kirk M. Suonvieri, Janine I. Suonvieri, Todd Ju-bie, Thomas Jubie, Kathie Jubie and Timothy Jubie, **Defendants.**

Civ. No. 5–91–86.

United States District Court, D. Minnesota, Fifth Division.

March 31, 1995.

John F. Bonner, III, Kathryn J. Bergstrom, Parsinen Bowman & Levy, for plaintiffs First State Bank of Floodwood, Floodwood Agency, Inc., John F. Shilling, William J. Gravelle, Joseph Bullyan, and Eugene J. Stowell.

Keith M. Brownell, Brownell Law Office, Duluth, MN, for defendants Jerry J. Jubie, Irene M. Jubie, Kirk M. Suonvieri, Janine I. Suonvieri, Todd Jubie, Thomas Jubie, Kathie Jubie, and Timothy Jubie.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties as authorized by Title 28 U.S.C. § 636(c)(3), upon the Plaintiffs' Motions for Judgment as a Matter of Law, for a New Trial as to Damages, and for attorneys' fees.

A Motion on the Hearings was conducted on June 2, 1994, at which the Plaintiffs appeared by John F. Bonner, III, and Bradley A. Kletscher, Esqs., and the Defendants appeared by Keith M. Brownell, Esq. Post–Hearing filings were submitted by both parties.

For reasons which follow, we deny the Motion for Judgment as a Matter of Law and for a New Trial as to Damages, and we grant the Motion for attorneys' fees.

### II. *Factual and Procedural Background*

In the year or more that preceded August 8, 1988, the Plaintiffs and the Defendants engaged in extensive negotiations concerning the Plaintiffs' purchase of the common stock of the First State Bank of Floodwood ("Bank") from the Defendants.[1] The parties' preliminary negotiations led to an initial Purchase Agreement, which the parties entered on October 9, 1987. Reflective of the deep financial distress that the Bank was experiencing, the Purchase Agreement afforded the Plaintiffs an expansive opportunity to examine the books, records and accounts of the Bank. The Record reflects that the Plaintiffs, who are experienced businessmen and Certified Public Accountants, accepted the opportunity afforded by surveying the Bank's accounts and, in holding two positions on the Bank's then existing Board of Directors, the Plaintiffs had occasion to micro-analyze the Bank's financial state.

The Bank was not merely experiencing financial difficulties, however, as the Bank's Officers and Directors were under investigation by Federal and State banking regulators—an investigation that had proceeded for the two-year period prior to the Bank's ultimate purchase by the Plaintiffs. As a result of that investigation, on January 4, 1988, the Federal Deposit Insurance Corporation ("FDIC"), issued an Order which prohibited the Defendant Jerry J. Jubie ("Jubie"), who had been the President, Chairman of the Board and the principal shareholder of the Bank, from "serving as an officer or director of, or in participating in any manner in the conduct of the affairs of, any bank insured by the FDIC," without prior written approval of the appropriate Federal Banking Agency.

On February 1, 1988, the FDIC also issued a Cease and Desist Order which directed the Bank's Officers and Board to follow a series of remedial means to rectify the Bank's prior "unsafe and unsound banking practices and violations of law and regulations." The Plaintiffs admit to being informed about the Cease and Desist Order, but they deny any knowledge of the FDIC's Order precluding Jubie from Federal banking activities—at least at any time prior to the date on which the sale of the Bank was consummated. The Defendants have vehemently contended that the Plaintiffs were fully informed of all of the activities of the FDIC, and that they had contractually authorized the Plaintiffs' "ac-

---

1. In a different context, we have recounted the underlying facts of this case somewhat exhaustively. See, *First State Bank of Floodwood v. Jubie*, 847 F.Supp. 695, 697–703 (D.Minn.1993). While that recitation was related to the parties' Motions for Summary Judgment, with but minor exception, that rendition of the facts closely paralleled the evidence which was adduced at trial. Here, we only briefly summarize the factual context for the Plaintiffs' pending Motions.

cess to all State and Federal regulatory agency records, studies, audits and other information, including those performed by or on behalf of FDIC."

For a number of reasons, including the ongoing Federal regulatory investigation and the need to secure the regulator's approval of any change in the Bank's ownership and management, the initial date for the sale of the Bank was continued, from October of 1987, until August of 1988. During that period of delay, the parties continued in their negotiations and, on July 28, 1988, they entered an "Addendum to Purchase Agreement," which modified a number of the terms and conditions of their prior Agreement. Among other changes, the Addendum established the purchase price of the Bank at $528,582.00, which was 95% of the book value of the Bank, as disclosed by the Bank's financial statements for the period ending as of June 30, 1988. This purchase price was subject to certain "usual and customary month-end adjustments," which were to be made by the Defendants' accountant. The Plaintiffs have contended that the Defendants manipulated a number of the month-end adjustments so as to over-value the worth of the Bank and, resultantly, its purchase price. The Defendants have denied any such wrongdoing and they have presented evidence to that effect.

In addition, the Addendum required the Defendants to pay-off, pay-down, or to guarantee the payment of a series of loans to the Jubie family members, so as to assure the repayment of a series of reputed "bad debts." As security for these guarantees, the Defendants pledged the proceeds from a Retirement Agreement that the Bank had extended to Jubie in March 10, 1987, in consideration for his 21 years of "faithful service" to the Bank. Although the parties' original Purchase Agreement, and its Addendum, are rife with references to this Retirement Agreement and, particularly, its status as security

for the Defendants' pledges, the Plaintiffs have contended, after the Bank was purchased, that the Retirement Agreement either had not received the approval of the Bank's Board of Directors and/or of the pertinent regulatory authorities, or that any such approval was *ultra vires*. Along with nearly every other factual issue at trial, the legitimacy of the Retirement Agreement was hotly contested, and was the subject of substantial, conflicting testimony. For the Defendants, and in particular Mr. and Mrs. Jubie, who were the immediate beneficiaries of the Retirement Agreement, the continuation of monthly pension payments from the Bank was a critical component in ascertaining the purchase price of the Bank. As the evidence, albeit contested, at trial reflected, the value of the Retirement Agreement to the Jubies was in the hundreds of thousands of dollars.

Following the closure of the Bank's sale, which occurred on August 9, 1988, the Plaintiffs began to uncover what they regarded as anomalies in the Bank's financial accounts. According to the parties' Agreements, the Bank's books were to be maintained according to "generally accepted accounting practices." The Plaintiffs have asserted that the Defendants did not merely violate the terms of the Purchase Agreements, but that they engaged in a pattern of fraud that was accomplished "through insider loans, under collateralization of loans [which were] not in conformance with generally accepted banking practices, and [by] not properly recording information on the Bank's financial statement." As a result of the Defendants purported wrongdoing, the Plaintiffs presented evidence that they were required to invest in the Bank some $424,000 in additional capital in order to satisfy the applicable regulatory requirements, and that they had suffered losses in the amount of $349,745.47. These claims of loss were fervently challenged by the Defendants' evidence.

Subsequently, the Plaintiffs commenced this action which alleges, in a lengthy Amended Complaint, that the Defendants [2]

**2.** Although the Interrogatories of the Special Verdict form specified the Defendant who was accused of the various breaches and fraudulent activities, we collectively refer to the "Defendants" for convenience, as the specific identifica-

breached their contractual agreements with the Plaintiffs, breached their fiduciary duties to the Bank, committed common law and statutory fraud, under both State and Federal enactments, and violated the provisions of the Racketeer Influenced and Corrupt Organizations Act, Title 18 U.S.C. § 1961 *et seq.* ("RICO").[3] In responding to this Complaint, the Defendants have not only denied any wrongdoing, but they have also asserted counterclaims which allege that the Plaintiffs have breached the terms and conditions of the Purchase Agreements and, more particularly, the Jubies' Retirement Agreement.[4]

The matter came on for trial before a Jury on April 4, 1994, and consumed a total of 17 days of trial time, in which 23 witnesses were called to testify, and a total of 326 exhibits were received. By way of an understatement, the animosity of the parties was a constant presence before the Jury. Following the charge to the Jury, and the arguments of counsel, the Jury retired for their deliberations, with a written copy of the Jury Instructions. After 5 full days of deliberations, the Jury returned its Special Verdict which found that the Defendants had breached their contract with the Plaintiffs, had breached their fiduciary duties to the Bank, had violated Minnesota Statutes Sections 80A.01 and 325F.69, and had caused the Plaintiffs to suffer damage in the total amount of $106,218.00. The Jury rejected the Plaintiffs' claims that the Defendants had violated Rule 10b-5 of the Securities and Exchange Commission or had committed common law fraud[5] and, while the Jury found that the Defendants had violated RICO, they concluded that the Plaintiffs had not suffered any damages from that violation. With respect to the Defendants' counterclaim, the Jury determined that the Plaintiffs had breached the terms and conditions of their agreement to purchase the Bank, and that the Defendants—namely Mr. and Mrs. Jubie—had suffered damages, as a result of that breach, in the amount of $292,947.00.

Upon this Verdict, the Court issued its Order for Judgment, on May 4, 1994, and Judgment was entered by the Clerk of Court on that same day. On May 11, 1994, the Plaintiffs filed their Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial as to Damages, together with

---

tion of one Defendant or another is not germane to the issues before us.

3. All or some of the same claims were filed in one or more actions in the Minnesota District Courts for St. Louis and Carlton Counties. The parties have not advised us of the status of those matters, nor has either party asserted that any ruling by the State Courts has a *res judicata* or a collateral estoppel effect here. Suffice it to say that, with vigor, each of the parties has demonstrated no reluctance toward litigiousness.

4. The Defendants had also asserted a defamation claim, which arose out of the Plaintiffs' communications to the Federal Bureau of Investigation that characterized certain of the Defendants actions as criminal in nature. By Order dated October 23, 1993, the Court granted the Plaintiffs' Motion for Summary Judgment as to the defamation counterclaim and, at the time of trial, the Court directed an entry of Judgment in the Plaintiffs' favor as to the Defendants' claim that the Plaintiffs had breached their agreement to continue the Jubies' health care benefits through the Bank's group plan. *First State Bank of Floodwood v. Jubie,* supra at 708-09. Our rulings on these two counterclaims are not now challenged, and we do not address these issues further.

5. Both parties note some facial tension between the Jury's determination that the Defendants were not guilty of common law fraud or of a Rule 10b-5 violation, and their finding that the Defendants were guilty of statutory fraud, under two of Minnesota's fraudulent transaction enactments. Neither party claims error in this respect, and neither has suggested any perversity in the Jury's Verdict. Since the issue is not before us and is not germane to the Motions that are, we merely note that a careful Jury could, with consistency, find the various statutory violations and, nonetheless, conclude that they did not arise from representations that were made, by either Mr. or Mrs. Jubie, to each and every one of the individual Plaintiffs. Moreover, under the Instructions given by the Court—which neither party here contests—the distinction between the State statutory fraud claims and the Federal and common law claims rests in the fact that the former did not require a finding of scienter. Therefore, were we called upon to rule on the matter, we would find no perversity in the Verdict that the Jury returned. See, *Lockard v. Missouri Pac. R.R.,* 894 F.2d 299, 304-05 (8th Cir.1990) ("We therefore must attempt to reconcile the findings, by exegesis if necessary, * * * before we are free to disregard the jury's special verdict and remand for a new trial."), cert. denied, 498 U.S. 847, 111 S.Ct. 134, 135, 112 L.Ed.2d 102 (1990).

their Motion for Attorneys' Fees pursuant to Minnesota Statutes Sections 8.31, Subdivision 3a, 80A.23, Subdivision 1, and 325F.69. No Post–Trial Motions were filed by the Defendants.

## III. *Discussion*

At the outset we note that the Plaintiffs have cast these Motions in a somewhat simplistic framework. In essence, the Plaintiffs contend that they would not represent anything that they did not believe to be true and, therefore, that the Court must believe all that they have represented. Indeed, their presentations to the Jury employed much of the same framework and, in large measure, the Jury rejected the Plaintiffs' evidence as unconvincing. While we do not question the earnestness with which the Plaintiffs hold their beliefs as to the true facts of this matter, we are not at liberty, absent compelling reason, to reject the Jury's resolution of contested facts. See, *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962).

At the parties' urging, and consistent with our obligations under the law, we have carefully examined the Record before us and we find no basis, in fact or law, to disturb the Jury's resolution of the factual issues. As a consequence, we find no merit to the Plaintiffs' contention that they are entitled to the entry of Judgment or a new trial on the RICO issue, that they are deserving of a new trial on the issue of their damages, or that the Defendants are not entitled to the damages that were assessed by the Jury. Although we do find merit to the Plaintiffs' request for attorneys' fees, we award only those fees that are reasonable under the circumstances. We turn, therefore, to an examination of the contentions raised in the Plaintiffs' Post–Trial Motions.

**A.** *The Plaintiffs' Contention that they are Entitled to the Entry of Judgment or, Alternatively, to a New Trial on the RICO Issues.*

■ Relying upon the Court's holding in *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992), cert. denied, —— U.S. ——, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993), the Plaintiffs urge the Court to alter the Jury's responses to Interrogatories 28, 30, and 32, on the Special Verdict form, and to conclude, as a matter of law, that the Plaintiffs are entitled to $318,644 in RICO damages; i.e., three times their actual damages of $106,218. Simply put, the Plaintiffs' argument is unconvincing.

■ Here, unlike in *Rosario*, the Jury expressly exonerated the Defendants from liability under RICO by finding that the Plaintiffs did not suffer any damage as a proximate result of the Defendants' RICO violations. Wisely, the Plaintiffs do *not* assert that the law requires no causal connection between a violation of RICO and resultant damage, because the authority to the contrary is compelling. See, *Title 18 U.S.C. § 1964(c)* ("[A] person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor * * * and shall recover threefold the damages he sustains * * *" [emphasis supplied]); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ("by reason of" language construed to incorporate traditional requirements of proximate or legal cause); *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1325 (8th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993). Rather, the Plaintiffs would have us overlook the Court's observation in *Rosario* that, there, the Jury found the Defendants to be liable on two Counts of RICO violations. This we may not do, since causation is uniquely an issue for the Jury particularly where, as here, "several damage causing factors" were presented for the Jury's determination.[6] See, *H. Enter-*

---

**6.** We would also take issue with the Plaintiffs' interpretation of the Court's holding in *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993), as suggesting that a Court should treble the damages of any finding of liability, on independent grounds, when that liability may be premised upon one of the acts upon which the Plaintiff predicates his RICO claim. *Rosario* permits no such construction. If, as in *Rosario*, there is conduct which is sufficiently circumscribed so as to permit the Court to conclude that the exact same conduct served as the predicate for not only a finding of fraud, but also for a

*prises International Inc. v. General Electric Capital Corp.*, 833 F.Supp. 1405, 1418 (D.Minn.1993), citing *Cashman v. Allied Products Corp.*, 761 F.2d 1250, 1254 (8th Cir.1985).

Moreover, during the Charge Conference, the Court and counsel for the parties considered the potential that, if the RICO claims were submitted to the Jury, some mechanism would have to be devised in order to determine what portion of the damages found, if any, the Jury would attribute to a RICO violation, if a violation were found. After much consideration and drafting, Interrogatory 34 was developed. In answering this Interrogatory with an inexorable "0", the Jury was reconfirming its earlier finding that the Plaintiffs had failed to prove any causation between the Defendants' RICO violations and the damages they claimed.

Accordingly, we find no basis to modify the Jury's resolution of the RICO claim—a resolution that we believe is amply supported by the evidence at trial.[7] Therefore the Plaintiffs' Motion for the entry of Judgment or for a New Trial on this basis is denied.

B. *The Plaintiffs' Contention that they are Entitled to a New Trial as to the Damages that they Sustained.*

■ The Plaintiffs claim that the Jury's award of damages to them, in the amount of

$106,218, was grossly inadequate given the testimony of their witnesses that they were obligated to invest an additional sum of $424,000 in order to properly fund the Bank's reserves, and that they had suffered damages, in the amount of $349,745.47, as a direct result of the Defendants' wrongdoing. Unfortunately, that testimony was challenged and the Jury had the responsibility of determining the true amount of damages that the Plaintiffs had sustained, if any. Having heard and seen the same evidence that the Jury necessarily had to appraise in resolving the damage claim, we are unable to say that the Jury's determination is without adequate support in the Record. Dependent upon the Jury's assessment of the credibility of the witnesses, the Plaintiffs' damage award could have been far greater or far less than the amount ultimately found. *Beckman v. Mayo Foundation*, 804 F.2d 435, 439 (8th Cir.1986); *Samuelson v. Central Nebraska Public Power & Irrigation Dist.*, 125 F.2d 838, 840 (8th Cir.1942). In short, we are unable to find any error in the Jury's determination of the Plaintiffs' damages, and the Plaintiffs' Motion for a new trial, on this ground, is denied.[8]

C. *The Plaintiffs' Contention that Jerry and Irene Jubie are Not Entitled to the Damages Found by the Jury.*

■ The Plaintiffs argue that a number of factors should vitiate the Defendants' entitle-

---

finding of liability under RICO, then a Court might well wish to remand if an internally inconsistent Verdict results. Here, however, the Plaintiffs contended that nearly every statement uttered by any of the Defendants was materially false, was justifiably relied upon, and resulted in damage. Obviously, the Jury agreed that one or more of those statements constituted a state statutory violation, but we cannot infer that all of the statements constituted fraud—as the Jury concluded that the Defendants had not committed common law fraud, nor did the Defendants violate Rule 10b–5 of the Securities and Exchange Commission. Since the bases for a common finding of liability under RICO, and under the legal precepts of fraud, were absent here, we find the Court's reasoning and conclusion in *Rosario* inapposite.

7. We think the Plaintiffs' reliance upon *Video Intern. Production v. Warner–Amex Cable Com.*, 858 F.2d 1075 (5th Cir.1988), cert. denied, 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989), is also misplaced. There, the Court was confronted, as the Court had been in *Rosario*, with liability findings by the Jury, but with a Jury's determination that the damages to be

awarded on those findings should be zero. Here, on the RICO claim, the Jury did not find the Defendants liable and, therefore, the circumstances in *Video* markedly differ from those we confront. Moreover, in *Video*, the Court appraised the evidence as involving "one set of facts demonstrating a single injury for which the jury could find liability under any one or all of three theories." *Id.* at 1085. No such characterization of the Record would be appropriate here. The Jury had a seemingly endless supply of allegedly fraudulent conduct to assess and, apparently, some of the conduct was adjudged to be violative of two statutory enactments but not of Federal regulatory law, and not of the common law of fraud. Unlike the facts of *Video*, the Plaintiffs here "presented, tried [and] argued their case as one in which discrete damages had been suffered under each claim." *Id.* The damages under a fraud claim are fact-driven—not every allegedly fraudulent act produces the same amount of damage. Therefore, here, unlike the claims in *Video*, the damages under each theory did not rest upon identical facts. *Id.* Accordingly, we find the Court's holding in *Video* to also be inapplicable.

8. We fully appreciate the "great deference" to be accorded our ability to "weigh the evidence, dis-

ment to damages. First, they contend that the Jury's finding of fraud should void the Retirement Agreement and obviate any obligation on the part of the Plaintiffs to make any payments in furtherance of that Agreement. This argument, however, makes no sense. The Plaintiffs have not sought a rescission of their contract, have not demanded a return of the purchase price of the Bank and, insofar as the Jury was concerned, have been made whole for any wrongful conduct that the Defendants perpetrated. The Jury considered all of the Plaintiffs' arguments— to the effect that the Retirement Agreement was void *ab initio*—but the Jury rejected, we think soundly, the Plaintiffs' claims in that respect. We are aware of no authority, and the Plaintiffs have drawn none to our attention, in which a disappointed litigant may parse through an extensive bargaining process and pick and choose those aspects of the bargain with which they wish to abide, and reject the remainder. The Jury awarded the Plaintiffs all of the damages, as a result of the Defendants' wrongful conduct, to which the Plaintiffs are entitled, and we will not augment those damages as some form of penalty arising from a state statutory violation.

■ Second, the Plaintiffs contend that, since the Defendants breached their obligations under the Purchase Agreement, the Plaintiffs' performance of their own obligations, under the Retirement Agreement, should be excused as a matter of law.[9] Once again, the Plaintiffs urge a novel theory— now of contract law—but without the benefit of any cogent authority. However else the Plaintiffs may wish to cast the matter, the Jury found them to be in breach of their obligations under the Purchase Agreement and, that being the case, they are in no better position than the Defendants to be excused from the performance of their remaining contractual obligations.

Next, the Plaintiffs assert that they did not breach their contract with the Defendants as a matter of law. As is the case with so many of their arguments, however, the Plaintiffs premise their contention on the assumption that the Jury's findings were in error because the Jury rejected the Plaintiffs' proof. We do not start from the same premise. The evidence does not compel a finding that the Plaintiffs had the right, as an absolute matter of law, to setoff the Defendants' payments under the Retirement Agreement as to any loan or guarantee that the Plaintiffs felt was appropriate. The Jury heard all that the Plaintiffs had to say in explaining their refusal to make payments under the terms of the Retirement Agreement, and the Jury could, and did, reject those explanations. We find no inadequacy in the evidence on this score.

■ Fourth, the Plaintiffs contend that the Court erred in permitting the Jury to assess the Defendants' damages in a lump sum amount. In this respect, the Plaintiffs argue that the Retirement Agreement was in the nature of an installment contract and, since there was no express agreement between the parties that would permit the Defendants to accelerate the installment payments, the Defendants' damages should be limited to the amount of the installments that

---

believe witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Brown by Brown v. Syntex Laboratories, Inc.,* 755 F.2d 668, 673 (8th Cir.1985), quoting *Ryan v. McDonough Power Equipment, Inc.,* 734 F.2d 385, 387 (8th Cir.1984). We have carefully sifted through the Record before us, and we conclude that the Jury's Verdict is not against the weight of the evidence and, therefore, should not be disturbed.

9. During the course of the Charge Conference, counsel for the Plaintiffs advised of his intention to urge the Jury to reject the Retirement Agreement as a legal nullity. Without objection from either party, the Court advised that a separate Interrogatory, as to the validity of the Retirement Agreement, would not be added to the Special Verdict form, as a finding that the Plaintiffs were in breach of the Retirement Agreement would establish its lawfulness as a matter of fact. Thus, we conclude, consistent with the Jury's factual determination, that the Retirement Agreement was valid and lawful as a matter of fact and law.

were past due at the time of trial. We disagree.

The Plaintiffs' objection to the measure of the Defendants' damages came late in the trial; indeed, just moments before the Defendants' economist was about to testify.[10] In contesting the Plaintiffs' objection, counsel for the Defendants noted that, on the first day of the trial—some sixteen days previously—he had requested and obtained the Court's Order that compelled the Plaintiffs to provide an accounting of their allocation of the Defendants' Retirement Agreement proceeds. While the Plaintiffs maintained that they were applying those proceeds to one "bad debt" or another, the Defendants had no means of knowing where those funds had actually been applied. Insofar as the Court is aware, the specific accounting, that was requested, was not forthcoming. Indeed, the Plaintiffs appeared to have been content to have the Jury determine the propriety of offsets, if any, based on the evidence that the

parties adduced at trial. In any event, we denied the Plaintiffs' Motion to preclude the Defendants from presenting evidence as to the future damages which, they claimed, would be attributable to the Plaintiffs' repudiation of the Retirement Agreement.[11]

We revisited the issue of the proper measure of the Defendants' contractual damages, during the course of the Charge Conference and, finding no change in the authorities upon which the Plaintiffs were relying, we again denied their effort to restrict the Defendants' claim for damages. The Plaintiffs have contended that, being an installment contract, the Retirement Agreement should be interpreted according to the general rule espoused in *Sheet Metal Workers Local No. 76 v. Hufnagle*, 295 N.W.2d 259, 264 (Minn. 1980), that where an acceleration is not clearly required by the terms of an installment payment contract, the Court will not presume that such an acceleration was intended. In addition, the Plaintiffs rely on the Court's holding in *Rishmiller v. Prudential Ins. Co.*, 192 Minn. 348, 256 N.W. 187 (1934).[12]

---

10. The Plaintiffs had filed Motions *in limine*, which sought to limit the testimony of the Defendants' economist in other ways, but it was only on the date of the economist's testimony that the Plaintiffs first suggested that the Defendants could be entitled to no more than their installment payments, under the Retirement Agreement, that were past due. See, *Docket No. 94*.

11. At the time that the Plaintiffs' objection to the Defendants' damage claim was first raised, the Plaintiffs relied upon the authority provided by *Rishmiller v. Prudential Ins. Co.*, 192 Minn. 348, 256 N.W. 187 (1934), and *Kithcart v. Metropolitan Life Ins. Co.*, 1 F.Supp. 719 (1932), both of which involved disability insurance policies in which the disability benefit would not be payable until proof of the disability, or of its continuing nature, had been submitted to the insurer. As we ruled at that time, these cases were distinguishable, since the Jubies did not have to demonstrate any continuing eligibility for their Retirement Agreement proceeds. Notably, however, even in such a circumstance, a lump sum payment may be proper when the obligor repudiates the contract or questions the entire validity of the contract—a circumstance that is entirely consistent with the Plaintiffs' arguments and efforts in this proceeding to have the Retirement Agreement eradicated. *Rishmiller v. Prudential Ins. Co.*, supra, 192 Minn. at 350–51, 256 N.W. at 188; *Kithcart v. Metropolitan Life Ins. Co.*, supra at 719–20.

12. Following the Hearing in this matter, the Plaintiffs submitted additional authority and, in particular, drew the case of *Quick v. American Steel and Pump Corporation*, 397 F.2d 561, 563 (1968), to our attention as particularly in point. While generally supportive of the Plaintiffs' posture, the Court's rationale in *Quick* provides, at most, an attenuated lifeline. Apparently, finding little in the presentations of the parties to illuminate the issue, the Court relied upon general contract law which, indisputably, favors a specific incorporation of an acceleration clause if acceleration is sought. While, as a general policy matter, we have no quarrel with the general rule, we think the circumstances presented by the Jubies' Retirement Agreement are distinguishable from the routine, commercial installment contract.

With regard to the circumstances before us, we think the more compelling rule was stated in *Talkington v. Anchor Gasoline Corp.*, 821 F.Supp. 505, 516 (M.D.Tenn.1993), as follows:

If the obligation to make payments in the future depends upon a condition the recipient must satisfy (even though not by the performance of a duty), then the federal rule is that the plaintiff has no present action for damages for total breach.

If on the other hand the plaintiff claims "not a right to future payments contingent on a continuation of present status, but a basic right to receive unconditional payments," then the action is one for damages for total breach, de-

We distinguish the Court's holding in *Rishmiller*—and inferentially in *Hufnagle*—for the same reasons that our Court of Appeals expressed in *Minnesota Amusement Company v. Larkin*, 299 F.2d 142, 152–53 (8th Cir.1962), a case that involved a retirement program not unlike that involved here. The Defendants' entitlement to future payments under the Retirement Agreement was not subject to any contingency, such as a disability or some other qualification, with the exception of the potential use of those proceeds as security for loan guarantees—a contingency which the Jury's determination would eliminate by its determination of what debts were truly "bad" and which were not. Moreover, we conclude, on the basis of all of the evidence adduced at trial, that the Plaintiffs absolutely and unqualifiedly repudiated their obligations under the Retirement contract. We do not suggest that they did so malevolently but, nonetheless, their actions were unilateral and resolute. Given the Plaintiffs' ostensible inability to specifically trace how the proceeds from the Retirement Agreement were applied, the Jury was relegated with the responsibility of determining what offsets should be applied—a task which the Jury fulfilled on the basis of the Record before it. Notably, by the time of trial, the Defendants had satisfied all of their obligations under the Retirement Agreement and their entitlement to the proceeds from that Agreement was unqualified except to the extent that the proceeds should be properly allocated to honor a "bad debt." Given the

salutary purposes [13] of a retirement benefit—which is essentially in the nature of an annuity—and the unique state of the evidence submitted by the Plaintiffs as to their treatment of the Retirement Agreement proceeds, we find no error in our submission of the Defendants' damages to the Jury.[14]

Lastly, the Plaintiffs urge that a new trial is necessary on the issue of the Defendants' damages since the Jury awarded more damages than the evidence warranted. Arguing that the Defendants' economist had testified that the present value of the Retirement Agreement was approximately $268,000,[15] the Plaintiffs question how the Jury could ever calculate the damage award at $292,947. The answer, of course, is simple. Although the Plaintiffs have correctly identified the substance of the Defendants' evidence on the future value of the Retirement Agreement, they have overlooked his testimony as to the value of the past payments under the Agreement that the Plaintiffs have adamantly refused to pay—namely, $75,640.06—a figure that was, again, expressed in present dollars. When both past and future damages are combined, the total award—if the Jury chose to accept the testimony of the Defendants' economist—would be in the amount of $345,326.09. Obviously, the Jury did not accept that figure as their award of damages, but we are without any basis to conclude that the award they chose was in error.

Finding no error in the Jury's calculation of the Defendants' damages, we deny the

---

spite the fact that the plaintiff has fully performed under the contract.

Here, the Plaintiffs' obligation to pay the Jubies was conditional only to the extent that the proceeds from the Retirement Agreement could be diverted to pay "bad debts" but, by the time of trial, the Jury would eliminate that contingency by determining what, if any amount, would be due to the Plaintiffs for "bad debts." The Plaintiffs having repudiated the Retirement Agreement, we believe the better rule is to require no more than one judicial proceeding to resolve the matter, without recurrent recourse to the Courts as successive monthly payments should become due and unpaid. *Id.*

13. None of the parties have addressed this issue in the context of the Employee Retirement Income Security Act, Title 29 U.S.C. § 1001 *et seq.*, and therefore, we hesitate to venture into those waters unguided. We would note, however, the substantial regulatory effort that has been ap-

plied to the proper creation, maintenance and preservation of retirement programs—reflecting a state of national concern and attention that has not been expended on generic installment contracts.

14. Moreover, we find no prejudice to the Plaintiffs since their future obligations were reduced to present dollars, at least insofar as that has been a recognized practice in the trial of civil cases. We are satisfied that the Plaintiffs did not reserve any purported "bad debts" so as to litigate them in the future, and the Jury had the benefit of the Plaintiffs' evidence as to the existence of any legitimate offsets.

15. In actuality, the Defendants' economist testified that the future damages to the date of Jubie's presumed death was equal to $269,686.03.

Plaintiffs' Motion for a new trial on that issue.[16]

### D. *The Plaintiffs' Motion for Attorneys' Fees.*

■ The Plaintiffs request an award of their attorneys' fees of $159,820.25, and a reimbursement of their costs in the amount of $13,888.69. Such an award of fees is permissible under Minnesota Statutes Section 325F.69, but is required, so long as the award is reasonable, under Minnesota Statutes Section 80A.23, Subdivision 2. See, *Specialized Tours, Inc. v. Hagen,* 392 N.W.2d 520, 539 (Minn.1986). The Plaintiffs rely upon the fee-shifting provisions of each of these statutes as authorization for their fee request.[17]

■ In contrast, the Defendants note that the Plaintiffs' fee request exceeds their award of damages by fully one-third and that, therefore, their fee request should be substantially reduced. In the Defendants' estimation, the Court should apply a percentage of the recovery approach, and reduce the Plaintiffs' fee request to $22,831. While appealing in its simplicity, we think that such a "mathematical approach [of] comparing the total number of issues in the case with those actually prevailed upon," produces a ratio that "provides little aid in determining what is a reasonable fee." *Hensley v. Eckerhart,* 461 U.S. 424, 435–36 n. 11, 103 S.Ct. 1933, 1940 n. 11, 76 L.Ed.2d 40 (1983).

■ Where, as here, the plaintiff is only partially successful on the claims that he has litigated, the plaintiff's fee request can be reduced accordingly. *Specialized Tours, Inc. v. Hagen,* supra at 542, quoting *Hensley v. Eckerhart,* supra at 436, 103 S.Ct. at 1940. In such circumstances the "most critical factor is the degree of success obtained." *Id.* Here, of course, the success of the Plaintiffs was substantially below their expectations and their testimony, for the Plaintiffs claimed to have suffered damages of $349,745.47. Even in accepting—as we do—that the claims on which the Plaintiffs were unsuccessful, "were interrelated, nonfrivolous, and raised in good faith," the results achieved cogently evince the excessiveness of the Plaintiffs' fee request. *Id.*

Here, our effort to determine a reasonable fee has been frustrated by a number of factors. First, the billing records of counsel for the Plaintiff are cryptic and of no particular assistance in meting out those billable hours which should properly be included in a fee award from those which should not.[18] Here, that difficulty has been exacerbated to the insurmountable because of the dual role that Plaintiffs' counsel played in this litigation. In addition to prosecuting the Plaintiffs' civil claims, the same counsel were defending against the Defendants' counterclaims. Given the relative substantiality of the Defendants' damage award in comparison to that awarded to the Plaintiffs, we may reasonably infer that a sizable proportion of the time and expense of Plaintiffs' counsel was exerted on the defensive rather than on the offensive. Our most careful review of the time entries of the Plaintiffs' counsel provides no

---

**16.** The Plaintiffs also assert that the Court should determine and apply the appropriate setoffs to the amount of damages determined by the Jury. We have no reason to believe that the Jury did not perform the task assigned to it, and we are aware of no other setoffs to which the Plaintiffs are entitled.

**17.** The Plaintiffs also contend that they are entitled to an award of attorneys' fees under RICO, citing the decision of the Court in *Rosario v. Livaditis,* supra. As we have already noted, however, the Court in *Rosario* determined that the Defendants there were liable for RICO damages but that the Jury erred in failing to calculate the amount of those damages. Here, no such contention can be responsibly advanced, since the Jury concluded that the Defendants' violation of RICO was not causally related to any of the

Plaintiffs' damages. Accordingly, no claim for attorneys' fees is warranted under RICO.

**18.** In this respect, we note that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). "Incomplete or imprecise billing records preclude any meaningful review by the district court of the fee application for 'excessive, redundant, or otherwise unnecessary' hours and may make it impossible to attribute a particular attorney's time to a distinct issue or claim." *H.J. Inc. v. Flygt Corp.,* 925 F.2d 257, 260 (8th Cir.1991), quoting *Hensley v. Eckerhart,* supra at 434, 437 and n. 12, 103 S.Ct. at 1940, 1941 and n. 12. Such was the case here.

enlightenment, however, in ascribing the time expended to either role that counsel played.

When faced with such obstacles, the Courts have accepted the practical reality that fee awards depend, in large part, on the capacity of the Trial Court to measure the worth of the services provided, taking into account the experience of trial counsel, the complexity of the litigation, the prevailing hourly rates for similar legal services, the desirability of encouraging attorneys to engage in socially beneficial, yet sometimes expensive litigation, and the efficiency with which counsel address the issues in contention. Nevertheless, as the Supreme Court has recognized:

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

*Hensley v. Eckerhart,* supra at 436–37, 103 S.Ct. at 1941.

With respect to the Minnesota Statutes which undergird the Plaintiffs' fee request, the Minnesota Supreme Court has adopted the same pragmatic approach. *Specialized Tours, Inc. v. Hagen,* supra at 542.

Here, given the obscurity of the Plaintiffs' time records, we are unable to "identify specific hours that should be eliminated" and, in fairness to counsel, an accurate division of his time, according to his defensive or prosecutorial function, would surely escape his capacity to be more definitive.[19] Cf., *H.J. Inc. v. Flygt Corp.,* 925 F.2d 257, 260 (8th Cir.1991) (suggesting the feasibility of a recommittal to remedy inadequate documentation). In view of these considerations, we conclude that the Plaintiffs' fee request warrants a substantial reduction. Fully as much, or more, of the trial of this matter was consumed by the Plaintiffs' effort to shield themselves from the Defendants' counterclaims as was expended in the advancement of their own causes of action. Since the full panorama of the parties' discovery is not before us, we reasonably infer that the same apportionment would apply to the pretrial processing of the case. Accordingly, we conclude that a reasonable fee for the time that was properly expended, in securing the limited success that the Plaintiffs achieved, is in the amount of $45,000. Such a fee award reflects the predominant effort that the Plaintiffs' counsel devoted to defending claims, whose damages exceeded those that the Plaintiffs' were found to have suffered, by threefold, and it further accounts for the savings in trial and pretrial time that would have been saved through a more focused prosecution of the Plaintiffs' claims.[20] In all, we consider this award to properly and accurately reflect "the relationship between the amount of the fee awarded and the results obtained." *Hensley v. Eckerhart,* supra at 437, 103 S.Ct. at 1941.[21]

---

**19.** We would acknowledge that the average hourly fee that was charged by Plaintiffs' counsel was reasonable but, if we were capable of deciphering the time entries meaningfully, we would substantially reduce the number of hours billed owing to the presence of two attorneys in what the Court would regard as a one-lawyer lawsuit. In invoking such a reduction, however, we mean no criticism for the only effective means by which experienced trial counsel can competently train their successors is in the polemics of the courtroom and, we suspect, this critical approach to the refinement of the trial bar was at play here.

**20.** As a pure matter of law, the Plaintiffs are not entitled to any fee shifting for their contract and common law fraud claims, nor are they entitled to fees for their RICO action or for their advancement of a Rule 10b–5 claim. Similarly, the fee shifting statutes, upon which they base their fee request, do not contemplate the award of fees for defending against counterclaims and, more particularly, valid ones. In light of these realities, we are troubled by the lack of effort on the Plaintiffs' part to pare their attorneys fee request accordingly, rather than to foist that task upon the Court. Accordingly, we are constrained to underscore the Supreme Court's admonishment that "[c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart,* supra at 434, 103 S.Ct. at 1940; *Specialized Tours, Inc. v. Hagen,* supra at 542 n. 25.

**21.** The Plaintiffs also request that the Defendants reimburse their "costs" in this matter. Although we have expended considerable effort in attempting to relate any of the claimed costs to a success

**1494**

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiffs' Motion for the entry of Judgment or, in the alternative, for a New Trial [Docket No. 133], is DENIED.

2. That the Plaintiffs' Motion for Attorneys' Fees [Docket No. 135], is GRANTED, and that the Defendants are directed to pay the Plaintiffs their attorneys' fees in the amount of $45,000.

3. That the Clerk of Court is directed to enter Judgment accordingly.

that the Plaintiffs have secured in this action, an intelligible result has evaded us, and the Plaintiffs have provided no guidance or assistance in this endeavor. As the Supreme Court noted in *Hensley*, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, supra at 437, 103 S.Ct. at 1941. The costs submitted appear to include meals, hotel rooms, duplicating expenses and the like. To separate any reimbursable costs from the routine overhead expense of operating a law office is an insuperable feat which can only unnecessarily dissipate our already scarce judicial resources. Therefore, we deny the Plaintiffs' request for costs as not supported by a proper evidentiary showing.